IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SYED KARIMUSHAN, ET AL. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL CHERTOFF, ET AL. | : | NO.  07-2995 |

**MEMORANDUM**

**Padova, J.**                                                                                                                   **June 11, 2008**

      Plaintiff Syed Karimushan and Defendants the United States Citizenship and Immigration Services ("CIS") and the Federal Bureau of Investigation ("FBI") have filed cross-motions for summary judgment in this action in which Mr. Karimushan seeks to compel the FBI and CIS to complete all required background checks and schedule him for a naturalization interview.  For the following reasons, we grant Mr. Karimushan's motion, deny Defendants' motion, and order CIS and the FBI to complete Mr. Karimushan's background check and schedule his naturalization interview to be conducted within ninety days of the date of the attached Order.

I.     BACKGROUND

      The undisputed facts are that Mr. Karimushan is a citizen of Bangladesh, but a permanent resident of the United States.  On or about June 1, 2006, Mr. Karimushan filed an application for naturalization, i.e., an "N-400" application, with CIS.  Pursuant to the Immigration and Nationality Act ("INA") and related federal regulations, when an individual applies for naturalization, CIS initiates a background investigation of the applicant, which includes a criminal background check that is conducted by the FBI.  See 8 U.S.C. § 1446(a); 8 C.F.R. §§ 335.1, 335.2(b).  Upon completion of that background check, the applicant is scheduled for an examination by a naturalization officer, who has the discretion to grant or deny the application.  8 U.S.C. § 1446(b), (d); 8 C.F.R. § 335.2(a), (c).

In Mr. Karimushan's case, on June 15, 2006, CIS submitted a request for a background security name check to the FBI, and eight days later, on June 23, 2006, Mr. Karimushan was fingerprinted. However, Mr. Karimushan has not yet been scheduled for an interview with CIS, and the results of his FBI name check, and his naturalization application, remain pending. Defendants have submitted affidavits, explaining that name check delays, in general, are due to a variety of factors, including the increased demand for name checks since September 11, 2001, and the limited resources of the FBI in processing those requests. (See Suppl. Decl. of Michael A. Cannon ("Cannon Decl.") at ¶¶ 22, 27.[1]) Defendants emphasize that the FBI has undertaken numerous initiatives to reduce name check processing times, and that those initiatives have improved the name check backlog. (Id. at ¶¶ 32-39.) However, as this case demonstrates, all delays have not been eliminated.

On June 20, 2007, when his naturalization application had been pending for approximately 13 months, Mr. Karimushan and his wife, Darla Karimushan, filed the instant action against CIS and the FBI, asserting that Defendants have violated section 706(1) of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(1), and are subject to an order in mandamus, because they have unlawfully withheld and unreasonably delayed required agency action, i.e., adjudication of Mr. Karimushan's naturalization application.[2] The relief they seek is an order requiring the FBI to complete Mr. Karimushan's criminal background and/or name check and requiring CIS to schedule his

---

[1] Mr. Cannon is the Section Chief of the National Name Check Program Section at the Headquarters of the FBI in Washington, D.C., a position he has held since March 2005. (Cannon Decl. ¶ 1.)

[2] Mr. Karimushan also sought agency action on a petition to remove the conditions on his permanent residency. However, those conditions were removed on August 1, 2007, and thus, that petition is no longer at issue.

naturalization interview. Defendants subsequently filed a motion to dismiss for lack of jurisdiction, which we denied on December 17, 2007. Both Mr. Karimushan and Defendants have now filed Motions for Summary Judgment, relying on the undisputed facts of record.[3] For the following reasons, we grant Mr. Karimushan's Motion and deny Defendants' Motion.

II.     LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making

---

[3]Curiously, Darla Karimushan, who is still a plaintiff in this action has not joined in her husband's Motion for Summary Judgment. Accordingly, within ten days of this Order, Darla Karimushan shall file with the Court a proposal for the disposition of her claims.

a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

III.   DISCUSSION

The issue on summary judgment in this case is whether CIS and the FBI have violated their duty to act on Mr. Karimushan's application within a "reasonable time" or have otherwise unreasonably delayed adjudication of Mr. Karimushan's application. On the one hand, Mr. Karimushan asserts that he is entitled to an immediate adjudication of his naturalization application, because the record establishes that Defendants have unreasonably delayed adjudication of that application. On the other hand, Defendants argue that any delay on the application is not unreasonable as a matter of law.

In Oil, Chemical, & Atomic Workers Union v. Occupational Safety & Health Administration, 145 F.3d 120 (3d Cir. 1998) ("OCAWU"), the United States Court of Appeals for the Third Circuit set forth a four-part test for analyzing claims of unreasonable delay.[4] That test is as follows:

---

[4] Defendants urge us to apply a six-part test for claims of unreasonable delay that is set forth in Telecomms. Research & Action Ctr. v. F.C.C., 750 F.2d 70 (D.C. Cir. 1984) ("TRAC"). The six factors enumerated in TRAC, which the District of Columbia Circuit Court describes as providing "useful guidance in assessing claims of agency delay," are as follows:

> (1) the time agencies take to make decisions must be governed by a "rule of reason;" (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

750 F.2d at 80 (citations omitted). As it is Third Circuit authority that is controlling in our Circuit,

> First, the court should ascertain the length of time that has elapsed since the agency came under a duty to act. Second, the reasonableness of the delay should be judged in the context of the statute authorizing the agency's action. Third, the court should assess the consequences of the agency's delay. Fourth, the court should consider "any plea of administrative error, administrative inconvenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources."

OCAWU, 145 F.3d at 123 (quoting The Raymond Proffitt Found. v. EPA, 930 F. Supp. 1088, 1102 (E.D. Pa. 1996)). "In the end, application of these factors to a particular case is fact-intensive," and we must afford the agency "'considerable deference in establishing a timetable for completing its proceedings.'" Id. (quoting Cutler v. Hayes, 818 F.2d 879, 896 (D.C. Cir. 1987)).

In this case, the delay at issue is just over two years, from June 1, 2006, when Mr. Karimushan filed his naturalization application, to the present. To put that delay in context, we note that CIS states in a January 2008 report accessible from the Department of Homeland Security website that processing time for naturalization petitions fell from a previous high of 14 months in February 2004, to approximately 5 months in September 2006. See Response to the Citizenship and Immigration Services Ombudsman's 2007 Annual Report, January 2008 ("Report"),[5] http://www.dhs.gov/xlibrary/assets/USCISO_Thematic_Response_2007_FINAL_OMB_cleared.pdf; see also 72 Fed. Reg. 4888, 4893 (Feb. 1, 2007) (stating that, as of September 30, 2006, processing time for N-400 applications is 5.57 months). According to the Report, CIS expected a subsequent influx of applications that had been filed in July and August 2007 to result in application times temporarily reaching 16-18 months. See Report. However, the CIS website currently reports that,

---

it is the four-factor OCAWU test that we apply here.

[5] Matters of public record, which include reports of administrative agencies, may be considered on summary judgment. See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir.1993).

as of May 21, 2008, average processing times for applications filed after June 2007 has been lowered to 13-15 months. See Advisory on Processing Times (May 21, 2008), http://www.uscis.gov (type "advisory on processing times" in search box and choose first result on list.).

Under the OCAWU test, we must next consider the reasonableness of the delay "in the context of the statute authorizing the agency's action." 145 F.3d at 123. The INA sets forth CIS's responsibilities with respect to adjudication of naturalization applications. 8 U.S.C. § 1446. It provides that before a person may be naturalized, CIS shall conduct a personal investigation of the applicant. Id. at § 1446(a). Accompanying regulations provide that the investigation shall consist "at a minimum, of a review of all pertinent records, police department checks, and a neighborhood investigation in the vicinities where the applicant has resided and has been employed, or engaged in business, for at least the five years immediately preceding the filing of the application." 8 C.F.R. § 335.1. Federal Regulations also state that CIS will schedule an interview with the applicant only after it receives "a definitive response from the [FBI] that a full criminal background check of an applicant has been completed." Id. § 335.2. A definitive response includes confirmation from the FBI that an applicant either does or does not have an administrative or criminal record, and that two fingerprint cards have been determined unclassifiable for the purpose of conducting a criminal background check.[6] Id.

---

[6]Defendants point out that as recently as the early 1990s, there was a presumption that no criminal record existed if the FBI failed to report on the status of an applicant's fingerprint check within 120 days of the fingerprints' submission, and naturalization applications would be processed on that assumption. See Hearing on INS Oversight Before the Subcommittee on Immigration of the Senate Judiciary Comm., 105th Cong., 2d Sess. (March 5, 1998), 1998 WL 110853. However, in response to questions regarding the integrity of the naturalization process, a new policy was instituted in the mid-1990s, whereby no naturalization interviews would be scheduled before receipt of a definitive response from the FBI. Id.

As the Defendants emphasize, and Mr. Karimushan concedes, the INA does not set forth a specific time frame in which naturalization petitions must be adjudicated. However, the statute does state that "[i]t is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application . . . ." 8 U.S.C. § 1571(b); see also 72 Fed. Reg. at 4893 (referring to the "six-month processing time standard" that CIS "strives to maintain."). It further defines CIS's "backlog" as "the period of time in excess of 180 days" that any immigration benefit application has been pending. Id. § 1572(a). Moreover, the statute and regulations provide that after an applicant's interview is completed, CIS shall render a decision on his or her application within 120 days in the absence of exceptional circumstances. See id. § 1447(b); 8 C.F.R. § 335.3(a). Thus, it seems plain that Congress did not anticipate the reasonable processing of applications to take over two years, as is the case for Mr. Karimushan.

Addressing the consequences of the agency's delay, Mr. Karimushan asserts that the delay has caused him "numerous economic and personal harms." (Pl.'s Mot. for Summ. Judg. at 19.) Specifically, he asserts that he has not been able to vote; has expended a great deal of money on applications, legal fees, and travel documents required of non-citizens; and has "suffered the stress and psychological pressure in awaiting the outcome of this arduous process."[7] (Id.) Mr.

---

[7] Mr. Karimushan also asserts that he has been unable to travel to visit his family in Bangladesh for many years. However, his "Unsworn Statement Pursuant to 29 U.S.C. § 1746" ("Karimushan Stmt.") clarifies that he traveled to Bangladesh in December of 2007. (Karimushan Stmt. ¶¶ 11-14.) As such, it appears that any restrictions on his travel have been lifted with the granting of his petition to remove the conditions of his permanent residency and his subsequent receipt of a green card. Indeed, this is consistent with the Declaration of Heidi Bijolle, a Supervisory Center Adjudications Officer for CIS ("Bijolle Decl."), which states that while Mr. Karimushan's naturalization application remains pending, he retains all of the rights and benefits of a permanent resident of the United States, including the right to travel freely abroad. (Bijolle Decl. ¶ 15.)

Karimushan's Unsworn Statement provides undisputed evidence that provides factual support for these assertions. (See generally Karimushan Stmt.)

Finally, under Third Circuit precedent, we must consider "any plea of administrative error, administrative inconvenience, practical difficulty in carrying out a legislative mandate or need to prioritize in the face of limited resources." OCAWU, 145 F.3d at 123. In this regard, Defendants make numerous arguments, although none directed specifically to the delay in the processing of Mr. Karimushan's application, as opposed to applications in general. According to Defendants' undisputed evidence, "[s]ince the terrorist attacks of September 11, 2001, the need to conduct more rigorous and thorough background checks on aliens who are seeking immigration status in the United States has required procedures that sometimes result in individuals not receiving their documents and benefits as quickly as in the past." (Bijolle Decl. ¶ 4.) Moreover, every year, there are increases in the number of name checks that the FBI is requested to perform, with the number of requests submitted in 2007 reaching 4 million. (Cannon Decl. ¶ 22.)

Defendants also note that the process of conducting a name check can be time-consuming; if a name generates a "hit," i.e., a possible match with a name in an FBI record, all records containing potential matches must be reviewed. (Id. ¶ 28.) With common names, as many as 200 hits can be generated, and the records that must be reviewed can be located in a variety of geographic locations, not necessarily easily accessible. (Id. ¶¶ 29-30.) The record establishes that the FBI has undertaken numerous initiatives to reduce the processing time for name checks, including that it has hired additional personnel, increased automation, centralized records, and improved training. (Id. ¶¶ 32-39.) As a result, the backlog of pending name checks has declined. (Id. ¶ 41.)

The undisputed record evidence establishes that CIS "generally works on the oldest name checks first -- a first-in, first-served protocol." (Id. ¶ 18.) On the other hand, CIS directs that the FBI expedite certain name checks "based on criteria it determines," and those name checks then move to the front of the queue. (Id. ¶ 19.) In addition, pursuant to one of the initiatives that the FBI and CIS have implemented in order to reduce the backlog of name checks, the Defendants prioritize the completion of name checks that identify only a single FBI file as being implicated in the check. (Id. ¶ 34.) CIS does not routinely request expedited processing when a mandamus action is filed. (Bijolle Decl. ¶ 13.) In fact, Defendants argue that expediting Mr. Karimushan's name check would prejudice "the millions of other applicants who are likewise awaiting completion of their name checks" (Defs.' Br. at 10), noting that the expediting of name checks is one factor that delays the processing of other applicants' checks. (Cannon Decl. ¶ 31.)

In Daraji v. Monica, Civ. A. No. 07-1749, 2008 WL 183643 (E.D. Pa. Jan. 18, 2008), the Court granted summary judgment to two plaintiffs who were in almost exactly the same position as Mr. Karimushan, having waited approximately two years for action on their naturalization applications. Id. at *5. In determining that the delay at issue was unreasonable, the Court applied the four-part test from OCAWU and reasoned as follows:

> The Court has considered the considerable administrative demands placed on the FBI Name Check Program and is sympathetic, but the Court is not in a position to relieve defendants of their obligation to comply with their mandatory duties, nor condone defendants' non-compliance. It is not the role of the judicial branch to weigh individual plaintiffs' clear rights to administrative action "against the agency's burdens in complying." Even a cursory review of the problems detailed in defendants' affidavits reveals that the delays suffered by current applicants for immigration benefits are the result not only of administrative overburdening in light of current "national security concerns," but also the culmination of a long history of insufficient funding and failure to computerize information at a rate

> adequate to meet administrative demands. If the primary cause of the delay to these plaintiffs' applications is a systemic problem, as defendants suggest, it requires a systemic solution that the Court is not in a position to fund nor implement. Defendants' arguments regarding administrative burdens would be more properly addressed to the political branches, which are in a position to either allocate additional resources to the Name Check Program, or modify the governing statutes and regulations.
>
> Conversely, defendants provide the Court with no evidence regarding delays caused by any error by these plaintiffs and allege no specific complication in processing their applications due to results from their FBI name checks. They do not allege any specific threat to national security posed by the [plaintiffs] themselves. Because defendants invoke national security concerns generally, we note that courts have found that if there is some legitimate national security risk posed by plaintiffs or other applicants currently living and working in the United States, this "surely militates in favor of prompt security checks, not in favor of delays." While the Court is mindful of national security in the immigration context, national security generally is not "a magic talisman that can be waived in front of the courts whenever the government seeks to insulate itself from judicial review." Without a specific demonstration that the [Plaintiffs] themselves pose a national security risk causing uncommon complications in their applications for naturalization, we find insufficient evidence of reasonableness on the agencies' part to withstand summary judgment.

Id. at *7 (citations and footnote omitted). The Court therefore ordered that the matter be remanded to CIS and that, within ninety days, the FBI complete its background check and CIS complete adjudication of the plaintiffs' N-400 applications.[8] Id. at *8.

---

[8]Notably, other cases have also suggested that a two-year delay may be unreasonable. See Alkenani v. Barrows, 356 F. Supp. 2d 652 (N.D. Tex. Feb. 14, 2005) (finding 15-month delay for naturalization application is not unreasonable, but citing cases suggesting that 2-year delay might be); Liu Duan v. Zamberry, Civ. A. No. 06-1351, 2007 U.S. Dist. LEXIS 12697 (W.D. Pa. Feb. 23, 2007) (denying motion to dismiss claim of delay, stating that delay of 1 ½ years for adjustment of citizenship status application might be unreasonable); Clayton v. Chertoff, Civ. A. No. 07-2781, 2007 U.S. Dist. LEXIS 76514, *15-*17 (E.D. Pa. Oct. 1, 2007) (stating that although delay of just over one year for application for adjustment of immigration status was not unreasonable, "delay may very well become unreasonable if Defendants do not act upon Plaintiff's application in the

In our case, we have carefully reviewed the record in conjunction with the four OCAWU factors, and in spite of our deference to CIS's and the FBI's timetables, we nevertheless find the undisputed facts support a finding that the delay that Mr. Karimushan has suffered is unreasonable. Like the Daraji Court, we are sympathetic to the Defendants' security concerns and administrative difficulties. However, none of those generalized concerns and problems address the delays associated with Mr. Karimushan's particular application. Indeed, under the "first-in, first-served protocol" (Cannon Decl. ¶ 18), it is undeniable that the FBI should have begun Mr. Karimushan's name check; if applicants who submitted their applications in September 2006 could expect their applications to be processed, on average, within five-and-a-half months (see Report), i.e., by February or March 2007, then the FBI certainly should have commenced the name check on Mr. Karimushan's June 2006 application well before now. In spite of this fact, there is no record evidence suggesting that they have done so. Likewise, there is no record evidence suggesting that there have been any particular problems with Mr. Karimushan's name check, if, in fact, it has even been started.[9] Rather, Defendants essentially ask us to take on faith that they are processing Mr.

---

foreseeable future.").

[9]Defendants present undisputed evidence that the FBI does not "publicly disclose" name check results, "because disclosing such results could alert plaintiffs or other individuals to the existence of pending investigations, thus compromising confidential sources or investigative techniques." (Cannon Decl. ¶ 43.) They further presents undisputed evidence that "the FBI cannot confirm that a name check result reveals that a person is *not* a subject of an FBI investigative record, because a denial as to one person may imply that silence as to others could be taken as confirmation that they are of investigative interest." (Id.) Here, we do not suggest that Defendants, in attempting to establishing the reasonableness of the unusual delay at issue, should have revealed if Mr. Karimushan's name check has come back negative; rather, we assume that if it had come back negative, his application would have been adjudicated by now. We suggest only that the Defendants, to establish reasonableness, should tell us, generically, if the delay Mr. Karimushan is experiencing is the result of "hits" on his name check. Such nonspecific information, without any detail as to the records that the hits identified or the subject matter of any resulting investigation, does not implicate

Karimushan's application as promptly as possible given its overall security concerns and administrative difficulties with immigration applications in general.

On summary judgment, we cannot take this representation on faith, but must instead look at the record evidence before us. As set forth above, the undisputed evidence establishes that Mr. Karimushan filed his naturalization application over two years ago, well before CIS advertised an average five-month processing time for naturalization applications. In spite of those facts, there is no record evidence that there has been any progress on Mr. Karimushan's name check. Cf. Kiromi v. District Dir., USCIS Detroit, Civ. A. No. 07-10446, 2007 WL 2049521, *2 (E.D. Mich. July 13, 2007) (two-year delay in processing of adjustment of status application is reasonable, where record evidence shows that applicant was identified as possible subject with FBI record). While this may be the result of inadequate funding or name check resources, there is simply no record evidence that establishes a causal connection between those problems and the inordinate delay associated with Mr. Karimushan application. In the end, considering the statutory scheme, which anticipates (albeit does not mandate) a 180-day processing time, and the absence of any evidence explaining the reason for Mr. Karimushan's particular two-year delay, we can only conclude that the delay is unreasonable.

IV.   CONCLUSION

For the foregoing reasons, we grant Mr. Karimushan's Motion for Summary Judgment, deny Defendants' Motion for Summary Judgment, and enter judgment in Mr. Karimushan's favor. The FBI shall complete Mr. Karimushan's name check and CIS shall schedule his naturalization interview within ninety days of the date of the accompanying Order.

---

Defendants' concern regarding public disclosure of the name check's "results," which, according to Defendants, would alert Mr. Karimushan or other individuals to the existence of pending investigations and compromise those investigations.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SYED KARIMUSHAN, ET AL. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL CHERTOFF, ET AL. | : | NO. 07-2995 |

**ORDER**

**AND NOW**, this 11th day of June, 2008, upon consideration of Plaintiff Syed Karimushan's Motion for Summary Judgment (Docket No. 20), and Defendants' Motion for Summary Judgment (Docket No. 21), **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion is **GRANTED**.

2. Defendants' Motion is **DENIED**.

3. **JUDGMENT IS ENTERED** in favor of Plaintiff Syed Karimushan and against Defendants.

4. The United States Citizenship and Immigration Services and the Federal Bureau of Investigation shall both complete the criminal background check of Mr. Karimushan and schedule Mr. Karimushan's naturalization interview within ninety (90) days of the date of this Order.

5. Within ten days of the date of this Order, Plaintiff Darla Karimushan shall file with the Court a proposal for the disposition of her claims in this matter.

BY THE COURT:

/s/ John R. Padova, J.
John R. Padova, J.